Samuel KATKIN and Doris
Katkin, Appellants,

v.

COMMISSIONER OF INTERNAL
REVENUE, Appellee.

No. 77–1483.

United States Court of Appeals,
Sixth Circuit.

Argued Dec. 2, 1977.

Decided Jan. 26, 1978.

John S. Nolan, Miller & Chevalier, Washington, D. C., for appellants.

M. Carr Ferguson, Asst. Atty. Gen., Tax Div., U. S. Dept. of Justice, Washington, D. C., Gilbert E. Andrews, Grant W. Wiprud, F. Arnold Heller, Stuart E. Seigel, Chief Counsel, Internal Revenue Service, Washington, D. C., for appellee.

Before CELEBREZZE, LIVELY and MERRITT, Circuit Judges.

LIVELY, Circuit Judge.

The question in this case is whether the receipt of stock in 1971 by shareholders of a corporation which was a party to a 1968 merger that qualified as a tax-free reorganization constituted a "deferred payment" within the meaning of section 483 of the Internal Revenue Code, 26 U.S.C. § 483. Section 483 provides in general for imputation of interest according to a statutory formula to any payment under a contract for the sale or exchange of property which constitutes part or all of the sales price and which is deferred for more than one year after the sale or exchange, where no interest or inadequate interest is provided for.[1]

The taxpayers exchanged their stock in two corporations, Detroit Bolt and Nut Co. (Detroit) and Quinn Manufacturing Co. (Quinn), for the stock of Whittaker Corporation (Whittaker) pursuant to an acquisition agreement and plan of reorganization dated August 19, 1968. Because the parties were unable to agree on the exact value of the Detroit and Whittaker stock, the taxpayers also received, as part of the exchange, a nonassignable right to receive additional shares of Whittaker stock. The agreement provided that additional Whittaker stock (up to a certain maximum) would be issued if the value of the Whittaker shares received at closing had not increased at least 20 percent by the third anniversary of the closing date. It was possible that no additional stock would be issued, since entitlement to it was contingent on the market performance of Whittaker stock. Whittaker set up a reserved stock account, and the maximum number of shares that could be issued was set aside for possible future delivery. By the third anniversary of the closing date, the value of the Whittaker stock had decreased substantially. Accordingly, in 1971, all of the Whittaker stock in the reserved stock account was issued to the taxpayers. The agreement did not provide for the payment of interest by Whittaker on that portion of the agreed exchange value which was represented by the shares of stock issued in 1971.

The Commissioner assessed an income tax deficiency for 1971 on the theory that the issuance of shares of Whittaker stock to the taxpayers in 1971 constituted a deferred payment in connection with the 1968 exchange of stock, applying Example (7), Treas. Reg. § 1.483–1(b)(6).[2] Upon petition

---

1. Section 483 in its entirety is printed as an appendix to this opinion.

2.     *    *    *    *    *    *

Treasury Regulations (1954 Code):
  Treas. Reg. § 1.483–1. Computation of interest on certain deferred payments.
      *    *    *    *    *    *
  (b) **Payments to which section 483 applies** —* * *

(6) **Examples.** The provisions of this paragraph may be illustrated by the following examples:

      *    *    *    *    *    *

  **Example (7).** M Corporation and N Corporation each owns one-half of the stock of O Corporation. On December 31, 1963, pursuant to a reorganization qualifying under section 368(a)(1)(B), M contracts to acquire the one-half interest held by N for an initial distribution on such date of 30,000 shares of M

by the taxpayers for a determination of no deficiency the Tax Court held "that the contingent payments of Whittaker stock received by petitioners in 1971 are subject to the imputed interest provision of section 483."

On appeal the taxpayers contend that the Tax Court did not seriously consider their argument that the transaction with Whittaker did not involve a deferred payment. They argue that they received a definite equitable interest in Whittaker in 1968 in exchange for their Detroit and Quinn stock and that the issuance of Whittaker stock to them in 1971 was merely a paper transaction which translated the previously unknown value into a certain number of shares. Hence, they claim, there was no payment in 1971. The government, on the other hand, maintains that the right to receive additional shares was in fact an evidence of indebtedness payable in stock three years after the merger was consummated, and that the issuance of Whittaker stock at that time was a payment.

The taxpayers have presented three closely related arguments which are based on the assumption that Congress has exempted the participants in corporate reorganizations from any and all tax consequences if the requirements for non-recognition of gain and loss are met. The government responds that the sweeping language of section 483 indicates that it applies to tax-free reorganizations as well as to other transactions where there is a deferred payment. It refers to the opening language of section 483, "For purposes of this title, in the case of any contract for the sale or exchange of property there shall be treated as interest . . ." and the provision in subsection (c)(1), "Except as provided in Subsection (f), this section shall apply to any payment on account of the sale or exchange of property which constitutes part or all of the sales price . . . ." Subsection (f) contains five exceptions to the application of section 483 and none of these exceptions relates to tax-free reorganizations. The government points out that the Eighth Circuit found the language of section 483 to be "comprehensive and unambiguous" in applying it to installment sales in *Robinson v. Commissioner of Internal Revenue*, 439 F.2d 767, 768 (1971).

The basic contention of the taxpayers is that the tax treatment of qualified reorganizations should not be affected by the fact that part of the equity interest received by shareholders of an acquired corporation is represented for a period of time by something other than certificates for a definite amount of stock. They point to the "continuing interest" theory which is often cited as justification for the special tax treatment accorded corporate reorganizations. See, *e. g., Mertens, Law of Federal Income Taxation*, Vol. 3, § 20.55, where the author states:

> The justification for the exemption from taxation of gains realized in corporate reorganizations is that the parties making the exchanges have simply changed the form of their corporate holdings and that what was formerly a corporate business carried on by a particular corporation, or corporations, in a particular corporate form, or forms, is to be now carried on and continued by other and perhaps new corporations having new corporate form.

Since in law their interest in Whittaker is a continuation of their interests in Detroit and Quinn, it is inconsistent with the overall tax treatment of qualified reorganizations to base tax consequences on the time at which indicia of ownership are delivered,

---

voting stock, and a nonassignable right to receive up to 10,000 additional shares of M's voting stock during the next 3 years, provided the net profits of O Corporation exceed certain amounts specified in the contract. No interest is provided for in the contract. No additional shares are received in 1964 or in 1965, but in 1966 the annual earnings of O Corporation exceed the specified amount and on December 31, 1966, an additional 3,000 M voting shares are transferred to N. Section 483 applies to the transfer of the 3,000 M voting shares to N on December 31, 1966. See example (2) of paragraph (e)(3) of this section for an illustration of the computation of total unstated interest in this case.

\* \* \* \* \* \*

they contend. In support of this argument the taxpayers point out that the holding period of stock received in exchange dates from the acquisition of the stock given in exchange rather than from the date of the exchange. 26 U.S.C. § 1223.

■ The fact that a shareholder who receives stock in an acquiring corporation is considered to have a "continuing interest" does not preclude the treatment of any issuance of stock to him subsequent to the initial exchange as a deferred payment. The continuing interest theory is irrelevant to the problem of unstated interest dealt with in section 483. Though the value which the taxpayers were entitled to receive under the acquisition agreement and plan of reorganization was fixed at the time of the initial transfer, the stock which was actually transferred at that time represented only a portion of that value. The taxpayers had the immediate right to vote the stock which was transferred to them at the time of the consummation of the merger and to receive dividends thereon. No such rights attached to the right to receive additional shares. The stock which was set aside in reserve by the acquiring corporation for three years was not property of the taxpayers and would not become their property unless the conditions of the agreement were met.[3] Until it was determined that these conditions had been met and the stock was issued to the taxpayers they had not received the full value for which they bargained in the acquisition agreement. Thus we conclude that the final payment in the agreement for exchange of stock was not made until the stock was issued to the taxpayers in 1971. *Webster's Third New International Dictionary*, Unabridged (1971 edition), defines "payment" as the discharge of a debt or an obligation. *Black's Law Dictionary* (Rev.Fourth Ed. 1968), defines it as the fulfillment of a promise or the performance of an agreement. The is-

suance and delivery of the stock to the taxpayers in 1971 was an occurrence within the plain meaning of the word "payment" as used in section 483.

■ The taxpayers also contend that their right to receive additional shares must be treated as stock in *Whittaker,* since nonrecognition of gain or loss would have been forfeited if they had received "boot" or other property. 26 U.S.C. § 356. From this position they argue that since they received nothing but stock, the scheme of non-recognition is somehow violated by treating part of the value of the 1971 shares as unstated interest. This argument is based primarily upon the decision in *Carlberg v. United States*, 281 F.2d 507 (8th Cir. 1960). The only question in *Carlberg*, which was decided before the enactment of section 483, was whether certificates of contingent interest are "stock" within the reorganization provisions of the Internal Revenue Code. The court held that such certificates are stock and that the lapse of time between the initial transfer and ultimate distribution of reserve shares does not of itself affect the qualification of the certificates as stock under the reorganization provisions.

The determination that certificates of contingent interest which are issued in connection with a corporate reorganization are "stock" and that delay in issuing stock certificates is not fatal to non-recognition of gain does not dispose of the question of whether such delay may properly be the basis for application of the imputed interest requirement of section 483. *Carlberg* did not address this question and does not provide an answer. The fact that certificates of contingent interest have been held to be stock of the acquiring corporation rather than "other property," 26 U.S.C. § 356(b)(2), does not require a holding that the value of the shares eventually to be exchanged for such certificates includes no unstated interest. Section 356 is concerned with the re-

---

**3.** This factor distinguishes the present case from one described in Rev.Rule 70–120 where a part of the stock of the acquiring corporation was held in escrow pending determination of the earnings of an acquired corporation. Though held in escrow for more than one year, the shares were registered in the names of the acquiring shareholders who were entitled to vote and receive all dividends paid on the escrowed stock. They received an immediate economic benefit from the escrowed stock at the time of the initial transfer.

quirements for non-recognition of gain or loss and does not deal with interest, the subject matter of section 483.

The taxpayers next argue that even if the transfer of stock in 1971 did constitute a deferred payment within section 483 Congress did not intend for that section to apply to corporate reorganizations which qualify for non-recognition of gain or loss. They rely on the familiar maxim of statutory construction that where there is an apparent conflict between statutes, the specific will prevail over the general, regardless of which is first enacted. *Bulova Watch Co. v. United States*, 365 U.S. 753, 81 S.Ct. 864, 6 L.Ed.2d 72 (1961). They maintain that the application of section 483 to that portion of the stock received in 1971 directly conflicts with the provisions of the Internal Revenue Code which recognize their transaction as a tax-free reorganization.

The taxpayers cite *Fox v. United States*, 510 F.2d 1330 (3d Cir. 1975), for the proposition that the general provisions of section 483 should not "override" other specific provisions of the Code which apply to established concepts of taxation law. *Fox* is an unusual case in which a divorced husband sought to obtain deductions for unstated interest which he contended was included in periodic alimony payments to his former wife. The court pointed out that the property settlement between the taxpayer and his divorced wife had been carefully drawn with attention to the tax consequences. The alimony was payable in 9½ years, thus falling within a provision which made the payments nontaxable to the divorced wife. Alimony payments are deductible by the husband only if they are taxable to the wife by virtue of section 215 of the Internal Revenue Code. Since the payments were not taxable to the wife, under section 215 there could be no deduction by the husband, and a deduction could not be contrived by imputing interest. Of course, this case may be distinguished on the ground that the settlement between the husband and wife was not a contract for the sale or exchange of property—the first requirement for application of section 483. Even if the settlement between husband and wife were considered a contract for the sale or exchange of property, however, we do not believe that the rationale of *Fox v. United States*, is controlling in the present case. In *Fox* there was a direct and inherent conflict between section 215, which dealt specifically with the deductibility of alimony payments, and any other provision of the Internal Revenue Code which might be construed to permit a deduction for payments by a husband to his divorced wife of amounts which were not taxable to her. No such direct conflict exists between the reorganization provisions and section 483.

The reorganization provisions permit non-recognition of gain from the exchange transaction itself. Imputed interest is ordinary income, not gain from the sale or exchange of property. When Congress provided for non-recognition of gain or loss from the sale or exchange of stock or other securities in certain corporate reorganizations it did not encase such transactions in a cocoon of non-taxability which shields them from every tax consequence to which they would otherwise be subject. Though the primary concern of Congress in enacting section 483 was to prevent the treatment of interest income as capital gain, the operative language of the statute is so all-inclusive, and its exceptions so clearly stated, that we can perceive no basis for holding that it does not apply to a qualified reorganization where part of the stock representing the sales price is transferred more than one year after the initial exchange.

We conclude that the majority of the Court of Claims reached the correct result in *Jeffers v. United States*, 556 F.2d 986 (1977), a case which is essentially indistinguishable from the present one. After preparation of this opinion began the Second Circuit released its opinion in a companion case, *Solomon v. Commissioner of Internal Revenue*, 570 F.2d 28 (No. 77–4120, December 14, 1977), in which it affirmed the Tax Court's deficiency findings. The taxpayers in *Solomon* owned all of the stock of Detroit and Quinn not owned by the Katkins. Thus, the facts (except for

the numbers of shares involved) and the legal issues are identical in the two cases. Noting Judge Mansfield's comprehensive treatment of the pertinent legislative history in *Solomon*, with which we agree, we have omitted discussion of that history from this opinion.

The judgment of the Tax Court is affirmed.

## APPENDIX

### § 483. Interest on certain deferred payments

(a) **Amount constituting interest.**—For purposes of this title, in the case of any contract for the sale or exchange of property there shall be treated as interest that part of a payment to which this section applies which bears the same ratio to the amount of such payment as the total unstated interest under such contract bears to the total of the payments to which this section applies which are due under such contract.

(b) **Total unstated interest.**—For purposes of this section, the term "total unstated interest" means, with respect to a contract for the sale or exchange of property, an amount equal to the excess of—

(1) the sum of the payments to which this section applies which are due under the contract, over

(2) the sum of the present values of such payments and the present values of any interest payments due under the contract.

For purposes of paragraph (2), the present value of a payment shall be determined, as of the date of the sale or exchange, by discounting such payment at the rate, and in the manner, provided in regulations prescribed by the Secretary or his delegate. Such regulations shall provide for discounting on the basis of 6-month brackets and shall provide that the present value of any interest payment due not more than 6 months after the date of the sale or exchange is an amount equal to 100 percent of such payment.

(c) **Payments to which section applies.**—

(1) **In general.**—Except as provided in subsection (f), this section shall apply to any payment on account of the sale or exchange of property which constitutes part or all of the sales price and which is due more than 6 months after the date of such sale or exchange under a contract—

(A) under which some or all of the payments are due more than one year after the date of such sale or exchange, and

(B) under which, using a rate provided by regulations prescribed by the Secretary or his delegate for purposes of this subparagraph, there is total unstated interest.

Any rate prescribed for determining whether there is total unstated interest for purposes of subparagraph (B) shall be at least one percentage point lower than the rate prescribed for purposes of subsection (b)(2).

(2) **Treatment of evidence of indebtedness.**—For purposes of this section, an evidence of indebtedness of the purchaser given in consideration for the sale or exchange of property shall not be considered a payment, and any payment due under such evidence of indebtedness shall be treated as due under the contract for the sale or exchange.

(d) **Payments that are indefinite as to time, liability, or amount.**—In the case of a contract for the sale or exchange of property under which the liability for, or the amount or due date of, any portion of a payment cannot be determined at the time of the sale or exchange, this section shall be separately applied to such portion as if it (and any amount of interest attributable to such portion) were the only payments due under the contract; and such determinations of liability, amount, and due date shall be made at the time payment of such portion is made.

(e) **Change in terms of contract.**—If the liability for, or the amount or due date of, any payment (including interest) under a

contract for the sale or exchange of property is changed, the "total unstated interest" under the contract shall be recomputed and allocated (with adjustment for prior interest (including unstated interest) payments) under regulations prescribed by the Secretary or his delegate.

**(f) Exceptions and limitations.—**

**(1) Sales price of $3,000 or less.**—This section shall not apply to any payment on account of the sale or exchange of property if it can be determined at the time of such sale or exchange that the sales price cannot exceed $3,000.

**(2) Carrying charges.**—In the case of the purchaser, the tax treatment of amounts paid on account of the sale or exchange of property shall be made without regard to this section if any such amounts are treated under section 163(b) as if they included interest.

**(3) Treatment of seller.**—In the case of the seller, the tax treatment of any amounts received on account of the sale or exchange of property shall be made without regard to this section if no part of any gain on such sale or exchange would be considered as gain from the sale or exchange of a capital asset or property described in section 1231.

**(4) Sales or exchanges of patents.** —This section shall not apply to any payments made pursuant to a transfer described in section 1235(a) (relating to sale or exchange of patents).

**(5) Annuities.**—This section shall not apply to any amount the liability for which depends in whole or in part on the life expectancy of one or more individuals and which constitutes an amount received as an annuity to which section 72 applies.